USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3-30-18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

JERRY GREENHAUS,      :      16 Civ. 10035 (RWL)

    Plaintiff,      :

    :      **MEMORANDUM**

    - against -      :      **AND ORDER**

    :

NANCY A. BERRYHILL, Acting Commissioner :
of Social Security,

    :

    Defendant.      :

---------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff, Jerry Greenhaus, brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of the determination by the Commissioner of Social Security that he is not entitled to disability insurance benefits ("DIB"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is DENIED, Mr. Greenhaus' motion for judgment on the pleadings is GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.[1]

Background

A. Procedural History

Mr. Greenhaus applied for DIB on June 23, 2014, alleging disability as of March 27, 2014. (R. at 213-214.)[2] After his claims were denied on initial review (R. at 122-135),

---

[1] The parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c).

[2] "R." refers to the administrative record, filed as part of the Commissioner's Answer. (Dkt. 7.)

1

Mr. Greenhaus requested a hearing before an administrative law judge ("ALJ"). (R. at 146-47). The hearing was held on February 23, 2015, before ALJ Ronald L. Waldman. (R. at 54-121.) At the hearing, Mr. Greenhaus was represented by counsel. (R. at 56.) On June 17, 2015, ALJ Waldman found that Mr. Greenhaus was not disabled. (R. at 26-38.) The Appeals Council denied review on November 2, 2016, thus rendering the ALJ's decision the final determination of the Commissioner. (R. at 1-4.)

B. Personal History

Mr. Greenhaus was born in 1962 and was fifty-one years old on his alleged disability onset date. (R. at 231.) Mr. Greenhaus is currently married and has two adult children. (R. at 301.) He received a high school degree and prior to March 2014, worked as a bus driver for the Metropolitan Transportation Authority ("MTA") for approximately thirty years. (R. at 58-61.) On March 27, 2014, Mr. Greenhaus was admitted to Stony Brook University Hospital for injuries sustained during a motorcycle accident in which he lost consciousness following a seizure. (R. at 315.) After this incident, Mr. Greenhaus ceased his work as a bus operator. (R. at 59.) Mr. Greenhaus' claimed disabilities include a back impairment, memory loss, and a seizure disorder.

C. Medical History

1. Diane Magliulo, M.D.

On February 20, 2012, more than two years before the alleged disability onset date, Mr. Greenhaus was examined by his primary care physician Dr. Diane Magliulo for complaints of dizziness, slurred speech, disorientation, and short-term memory loss. (R. at 410.) Mr. Greenhaus reported having experienced four seizures during the past three

months. (R. at 295.) A computerized tomography ("CT") scan conducted that day did not reveal any abnormalities. (R. at 295-96.)

On June 10, 2014, Dr. Magliulo completed a workers' compensation form representing that Mr. Greenhaus had been unable to work as of March 28, 2014, and that he would be able to perform his usual work by June 5, 2015. (R. at 400.) That same day, Mr. Greenhaus informed Dr. Magliulo that he was experiencing seizures after switching his medication from Keppra to oxcarbazepine without proper compliance. (R. at 402.) He also reported experiencing back pain. (R. at 397, 402.)

On July 1, 2014, Mr. Greenhaus reported to Dr. Magliulo that following an eye appointment, he experienced four seizures. (R. at 396.) He stated that he currently felt fine with the exception of a little lightheadedness. (R. at 396.) Two weeks later, on July 15, 2014, Mr. Greenhaus complained to Dr. Magliulo that the night before he had experienced a seizure during his sleep. (R. at 395.) That same day, Dr. Magliulo completed a workers' compensation form indicating that Mr. Greenhaus was disabled due to a seizure disorder, but that he would be able to return to his employment on June 14, 2015. (R. at 394.) Mr. Greenhaus reported another seizure to Dr. Magliulo in August 2014. (R. at 392.) On August 19, 2014, Dr. Magliulo completed a workers' compensation form indicating that Mr. Greenhaus was disabled due to a seizure disorder and that he would be able to perform his usual work by August 28, 2014. (R. at 394.)

On September 8, 2014, Mr. Greenhaus reported an episode of intense dizziness, accompanied by slurred speech and sore muscles, and three days later, he reported another seizure. (R. 653, 657.) In response, Dr. Magliulo conducted a sixteen-channel electroencephalography ("EEG"), which showed normal results. (R. at 656.) In a letter

dated September 10, 2014 to an unidentified recipient, stating that Mr. Greenhaus was seen on August 19, 2014, after he was admitted to the emergency room for a "breakthrough seizure" and that his neurologist was being notified and his medication was being changed. (R. at 598.) On September 19, 2014, Mr. Greenhaus reported that he had not experienced a seizure for a week. (R. at 660.) Dr. Magliulo filled out an additional workers' compensation form on September 19, 2014 indicating that Mr. Greenhaus would be able to return to his usual occupation on October 1, 2014. (R. at 659.) Dr. Magliulo filled out a final workers' compensation form on October 22, 2014, indicating that Mr. Greenhaus would be able to return to his usual occupation on December 31, 2014. (R. at 662.)

2. Itshak Haimovic, M.D.

By Dr. Magliulo's request, on February 29, 2012, Dr. Itshak Haimovic performed a neurological consultation for Mr. Greenhaus. (R. at 369-70.) Dr. Haimovic noted that Mr. Greenhaus was complaining of "increasing cognitive disturbances," which included feeling "lost and disoriented in familiar environments . . . , [having] difficulties recalling recent events or future plans . . . , [and having] increasing difficulties performing his job driving a bus." (R. at 369.) A CT scan of the brain revealed no abnormalities. (R. at 369.) Mr. Greenhaus scored a 29/30 on the Mini Mental Status Exam and could recall three sentences out of an eight-sentence story. (R. at 369.) He had normal gait, motor strength, reflexes, and coordination. (R. at 369-70.) A magnetic resonance imaging ("MRI") and an EEG of the brain, both conducted on March 9, 2012, also showed normal results, although neuropsychological screening indicated decline in all areas. (R. at 297, 372.) Dr. Haimovic advised him not to drive a bus without further evaluation. (R. at 374.)

4

After Mr. Greenhaus reported "persistent episodes of seizures," Dr. Haimovic conducted a follow up consultation on June 30, 2014. (R. at 413.) Mr. Greenhaus stated that he experienced approximately nine seizures that month, and that following these seizures, he was unresponsive, his speech was slurred, and he became extremely lethargic. (R. at 413.) A neurological exam did not reveal any abnormalities. (R. at 413.) Dr. Haimovic diagnosed him with a complex seizure disorder. (R. at 414.)

After experiencing at least five generalized seizure episodes and a hospital visit in connection with those episodes, Mr. Greenhaus followed up with Dr. Haimovic on August 28, 2014. (R. at 420.) The examination indicated that Mr. Greenhaus had intact integrative functions, full muscle strength, and normal reflexes and coordination. (R. at 408-22.) An EEG performed that day also showed normal results. (R. at 412.) Dr. Haimovic reported that Mr. Greenhaus had poor seizure control and recommended that he increase his dosage of Trileptal, continue taking Keppra, and start taking Vimpat. (R. at 422.)

On October 24, 2014, Dr. Haimovic reexamined him and did not change his diagnosis. (R. at 434-39.) After that consultation, Dr. Haimovic increased his prescribed dosage of Vimpat and Trileptal and prescribed Lamictal. (R. at 435, 438). An EEG in October 2014 and a forty-eight hour ambulatory EEG recording in December 2014 also showed normal results. (R. at 430, 445-46.) During an evaluation on November 20, 2014, Mr. Greenhaus reported experiencing two seizure episodes. (R. at 440.) The neurological exam did not reveal anything abnormal. (R. at 440-41.) Dr. Haimovic reported that the possibility of a partial complex seizure disorder remained and

recommended that Mr. Greenhaus continue to take his prescribed medications. (R. at 441.)

### 3. Edward Barnoski, M.D.

On April 27 and May 15, 2012, Mr. Greenhaus was evaluated by Dr. Edward Barnoski, a clinical psychologist and neuropsychologist, who was referred by Dr. Haimovic. (R. at 300-11.) The evaluation identified deficits in his working memory and processing speed. (R. at 309-10.) Mr. Greenhaus reported that earlier that year, he took time off from work to address issues of back pain, but stated that the pain was manageable. (R. at 302.) His wife, Rosemary Greenhaus, reported that he was experiencing "events" for approximately once a month, which lasted approximately thirty minutes and that afterwards he appeared imbalanced and lethargic. (R. at 302.) Mr. Greenhaus reported struggling with memory problems for a long time and that he used his phone to compensate for his memory difficulties. (R. at 302.)

Mr. Greenhaus' performance on Verbal Comprehension and Perceptual Reasoning tests were in the average range and his scores on Working Memory, Processing Speed, and Full Scale tests were in the low average range. (R. at 303-05.) Mr. Greenhaus' ability to sustain attention, concentrate, and exert mental control was in the low average range. (R. at 304.) His performance on the Auditory, Visual, Visual Working, Immediate, and Delayed Memory indexes were all in the average range. (R. at 305-06.) Based upon his level of education, his reading, spelling, and math were all below expectations. (R. at 307.) His fine motor control was extremely slowed bilaterally. (R. at 306.) Dr. Barnowski concluded, "[D]espite his reports of memory dysfunction . . . Mr.

Greenhaus' index scores fell in the average range in comparison to his same-age peers."
(R. at 309.)

4. Stony Brook University Hospital Admission

On March 27, 2014, Mr. Greenhaus was admitted to Stony Brook University Hospital following a motorcycle accident in which he lost consciousness. (R. at 315-317, 348.) His admitting diagnoses were for multiple closed rib fractures, pulmonary contusion, abrasions to left hand and left knee, and loss of consciousness. (R. at 316.) An EEG indicated a few left temporal sharp transient waves that raised concerns of irritability and possible seizure focus. (R. at 316.) During his admission, Mr. Greenhaus reported three seizure like events, one of which was witnessed by a nurse. (R. at 316.) He reported that he had experienced similar episodes starting three years prior and the episodes occurred intermittently. (R. at 316.) He was discharged on April 4, 2014, with the following diagnoses: left rib fractures, two through eight, left pulmonary contusion, left pneumothorax, left pulmonary contusions, and seizure remote and possibly recent. (R. at 317.) Upon discharge, he was also prescribed Robaxin, Oxycodone, Protonix, Flomax, and Keppra. (R. at 315.) He informed his treating team that as far as he could recall, this was his first seizure.[3] (R. at 61-62.) He was advised that under New York law, he should not drive until he was seizure-free for over a year. (R. at 317.)

5. Louis Manganas, M.D.

On May 7, 2014, Mr. Greenhaus was examined by a neurologist, Dr. Louis Manganas, for evaluation and management of his seizure disorder. (R. 348.) The

---

[3] This onset date for Mr. Greenhaus' seizure episodes is not consistent with the record. He reported experiencing seizures to Dr. Haimovic and Dr. Magliulo nearly two years prior, in 2012.

neurological examinations results were normal, but Dr. Manganas advised Mr. Greenhaus to continue taking Keppra twice a day, not drive until he achieved a one-year seizure free period, and not operate heavy equipment or machinery. (R. at 351-357.) He noted that he would follow up with Mr. Greenhaus' neurologist, Dr. Haimovic, and that they might "repeat neuropsycholigical testing do [sic] to poor memory." (R. at 357.) EEGs performed on May 30 and June 5, 2014 showed normal results, as did a CT scan of the brain conducted on June 5, 2014. (R. at 360, 367, 373.) A forty-eight hour ambulatory EEG recording made from June 9 through June 11, 2014, also showed normal results. (R. at 363-66.)

      6. <u>Southside Hospital Admissions</u>

In May 2014, Mr. Greenhaus was examined at Southside Hospital for pain on his left backside after he fell out of a chair. (R. at 387-391.) His physical examination showed paraspinal tenderness in his mid-back and upper back. (R. at 389.) Upon discharge, he was diagnosed with thoracic back pain and prescribed ibuprofen and Percocet. (R. at 389-390.)

On June 27, 2014, following two seizure episodes, Mr. Greenhaus presented at Southside Hospital. (R. at 558-64.) At that time, a physician or midlevel provider did not evaluate him, but he followed up with Dr. Haimovic three days later. (R. at 361-62.) On August 9, 2014, Mr. Greenhaus was examined at Southside Hospital after he experienced two seizures. (R. at 523-25.) He was prescribed Keppra and discharged without any significant remaining symptoms. (R. at 532.)

On October 6, 2014, Mr. Greenhaus was examined at Southside Hospital after reporting a seizure. (R. at 511-12.) Two weeks later, on October 20, 2014, after

experiencing a seizure, he was examined again. (R. at 448-61.) Examinations showed normal results. (R. at 449, 512.) On December 2, 2014, an examination at Southside Hospital for complaints of back pain showed that Mr. Greenhaus had musculoskeletal pain with tenderness to light palpation. (R. at 489-507.) After receiving injections of Toradol and Robaxin, he was discharged that same day. (R. at 499.) He was examined at Southside Hospital again on December 13, 2014, which showed that he had pain with lumbar spine palpation and decreased sensation in the left foot. (R. at 476.) He received additional injections on December 4, 2014, December 20, 2014, and January 12, 2015. (R. at 669-71, 681.)

7. Sheila Mongia, M.D.

On August 18, 2014, Dr. Shella Mongia, a consulting physician for the Administration, examined Mr. Greenhaus in connection with his DIB claim. (R. at 378-82.) Plaintiff reported that stress, flashing lights, fluorescent lights, and prolonged computer usage precipitated the seizures. (R. at 378.) He also reported having experienced three seizures on the prior Saturday. (R. at 378.) His seizures were typically marked by staring and spasms of his entire body; no contractions or tongue biting were noted. (R. at 378.) The frequency of his seizures varied from several per day to none for a couple of days. (R. at 378.) Mr. Greenhaus also reported that he had been experiencing non-radiating lower back pain for over five years. (R. at 378.) He said that activities, sitting, and standing made his back pain worse, while ice compresses, stretching, lying flat, and massage therapy alleviated the pain. (R. at 378.) At the time, he was taking the following medications: methocarbamol, enalapril, naproxen, diazepam, oxcarbazepine, pantoprazole sodium, oxycodone, Celebrex, and levetiracetam. (R. at

379.)  His daily activities included showering, bathing and dressing himself, watching television, listening to the radio, reading, socializing with friends, using the internet, cleaning at least twice a week, shopping once or twice per week, and visiting the park. (R. at 379.)

During the examination, Mr. Greenhaus had a normal gait, stance, and did not appear to experience any acute distress.  (R. at 380-81.)  He could squat fully without an assistive device and did not need any assistance in changing for the exam, getting on and off the exam table, or rising from his chair.  (R. at 380.)  Mr. Greenhaus' cervical spine range of motion was eighty degrees in flexion and extension, thirty degrees in lateral flexion bilaterally, and thirty degrees in rotation bilaterally.  (R. at 381.)  His grip strength was 5/5 and he had a full range of motion in his shoulders, elbows, forearms, wrists, knees, and ankles.  (R. at 381.)  Dr. Mongia diagnosed a seizure disorder and lower back pain.  (R. at 381.)  She opined that Mr. Greenhaus was mildly restricted in activities such as standing, prolonged sitting, and carrying, pushing, and pulling heavy objects and was markedly restricted in climbing, operating machines, and operating motor vehicles.  (R. at 382.)  She also opined that he should avoid heights and activities that put him at risk for falls or accidents.  (R. at 382.)

8.  Chris Prentiss, Physical Therapist

On August 18, 2014, Mr. Greenhaus started physical therapy with therapist Chris Prentiss for central low back pain.  (R. at 639.)  He received physical therapy five times in August and seven times in September.  (R. at 602-32.)

On January 13, 2015, Mr. Greenhaus recommenced physical therapy with Mr. Prentiss and attended therapy throughout January and February.  (R. at 689-726.)  As of

January 22, 2015, he reported that his pain had decreased and his ability to perform daily tasks had improved. (R. at 699.) However, throughout February 2015, he continued to report achiness, stiffness, and soreness throughout his body. (R. at 717-25.)

D. Testimonial and Vocational Evidence

At the February 23, 2015 hearing, Mr. Greenhaus testified that he lived with his wife and twenty-eight year old daughter, both of whom were employed, in Brentwood, New York. (R. at 58-59.) He represented that he had previously been employed as a bus driver for the MTA for approximately thirty years, but he had not worked since March 27, 2014. (R. at 59-61.) He tried to return to the MTA in the fall of 2014 as a sweeper, but after he experienced three seizures, he was asked not to return. (R. at 59-61.)

He testified that he experienced his first seizure in March 2014. (R. at 61-62.) After that incident, he initially experienced seizures on a daily basis, from three to five times per day, but starting in September, the frequency decreased to approximately three times per week. (R. at 62-65.) The seizures generally lasted from ninety seconds to two minutes, although they could occasionally be as long as five minutes. (R. at 64-66.) He stated that his doctors had informed him that if a seizure lasted more than two minutes, he should go to the hospital to have his blood pressure checked. (R. at 78-80.) The ALJ asked whether that part of his diagnosis was in the record and noted that he did not recall "seeing a medical source statement." (R. at 79-80.) Mr. Greenhaus testified that sometimes the only after-effect of the seizures was soreness in his muscles and that other times there were no physical side effects. (R. at 66-67.) Side effects from the medications he was taking for his seizure disorder included buzzing in his ears and grogginess. (R. at 83.) He also testified that at times he experienced memory loss and would repeat

stories that he had already told. (R. at 70-71.) Mr. Greenhaus testified that he had been to the emergency room approximately ten to fifteen times in the past year. (R. at 80-81.) Mr. Greenhaus also stated that he was receiving physical therapy three times a week for his back. (R. at 73.) He testified that he does not use a cane and he occasionally uses a back brace, but not on a regular basis. (R. at 74.) He claimed that he was capable of lifting eight pounds but not sixteen due to the pain in his back. (R. at 75-76.)

Mr. Greenhaus testified that he no longer drove or used power tools, but he was able to do laundry, dishes, dust, and other work around the house, as long as these tasks did not include lifting heavy objects. (R. at 68-69, 84-86.) He testified that he was able to take public transportation. (R. at 69.) His regular activities included using the internet, watching television, and sitting in the park. (R. at 88-90.) He stated that in 2014, he took a vacation to Florida and that he travelled there by airplane. (R. at 86-87.)

When asked if he could hold a job, assuming he only experienced back pain and did not have a seizure disorder, he testified that he was not sure. (R. at 71.) When asked if he would have difficulty fulfilling a clerical job, which would include tasks such as paperwork and reading emails, he stated that his memory might be an issue. (R. at 72.)[4] The ALJ asked Mr. Greenhaus' counsel whether there were "memory issues documented in the file," and counsel responded that it was not in the file, but that Mr. Greenhaus had informed Dr. Haimovich about his memory condition. (R. at 77-79.)

A medical expert, Dr. Osvaldo Fulco, also testified at the hearing. (R. at 91-110.) Based on a review of essentially the entire record, he opined that Mr. Greenhaus' seizure

---

[4] During his consultative exam with Dr. Mongia, Mr. Greenhaus also stated that prolonged computer usage tended to bring on seizures. (R. at 378.)

disorder met or equaled the frequency requirement of Listing 11.03[5] (non-convulsive epilepsy), but that his symptoms did not meet the requirement for transient postictal manifestation of unconventional behavior or interference with activity. (R. at 94-96.) Upon questioning, Mr. Greenhaus agreed that his post-seizure functioning was relatively normal, with the exception of his "memory issues." (R. at 95-96.) Dr. Fulco stated that it was "possible" that the medications Mr. Greenhaus was taking to control his seizure disorder to affect his memory and concentration, and that they "need to test his memory, definitely" but there was "nothing in the file." (R. at 107.)

Dr. Fulco testified that in light of his seizure disorder, Mr. Greenhaus should avoid working in hazardous conditions, including driving a motor vehicle, and exposure to heights and open spaces. (R. at 101.) Furthermore, Mr. Greenhaus would be "off task" ten percent of the time and absent from work once a month. (R. at 101.) The ALJ and Dr. Fulco agreed that if there was evidence that Mr. Greenhaus had cognitive deficits, those deficits could increase the percentage of time that Mr. Greenhaus was off-task to more than ten percent of the time. (R. at 108-09.) The ALJ then stated that he did not "really think that part of the case is well documented." (R. at 108-09.) Dr. Fulco further testified that Mr. Greenhaus' impairments did not meet or equal any other Listing. (R. at 97.)

A vocational expert, Esperanza Di Stefano, also testified at the hearing before the ALJ. Based on a review of the record, Ms. Di Stefano attested that Mr. Greenhaus' prior position as a bus operator qualified as a medium exertion, semiskilled position according to the Dictionary of Occupational Code, Title C ("DOT") 913.463-010. (R. at 112.) Ms. Di

---

[5] The Listings refers to Appendix I of the regulation, 20 C.F.R. § 404, subpt. P, app. 1.

Stefano testified that based on this prior work experience, Mr. Greenhaus would have the following transferable skills: the ability to follow rules and regulations and written and oral instructions, customer service skills, clerical skills, and expressive and receptive communication skills. (R. at 112-13.)

The ALJ posed the following hypothetical: would an individual who had the residual functional capacity ("RFC") to perform work at all exertional levels, but had the following non-exertional limitations be able to perform the work of a bus operator: an inability to work in hazardous work conditions, no driving, no exposure to heights or work in open work spaces, and would be required to be off-task ten percent of the workday and absent once a month. (R. at 113.) The expert testified that such an individual would not be able to work as a bus operator, but would be qualified to work certain medium exertion unskilled jobs such as hand packer, janitor, and laundry worker; light exertion semiskilled jobs such as file clerk and host; and light exertional, unskilled jobs such as mail clerk. (R. at 113-15.) Ms. Di Stefano stated that in her opinion, some employers, but not all, would tolerate two absentee days per month. (R. at 118-19.) Ms. Di Stefano also testified that if an individual had to be off task twenty percent of the time (as opposed to ten percent of the time), that individual would be "unable to maintain employment . . . because that would be more time off task than what most employers will tolerate." (R. at 116.)

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if he can demonstrate through medical evidence that he is unable to "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [12] months." 42 U.S.C. § 423(d)(1)(A). The disability must be of "such severity that he is not only unable to do his previous work but cannot considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner evaluates the claim under a five-step analysis. 20 C.F.R. § 404.1520(a)(4). First, the claimant must demonstrate that he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(1). Second, the claimant must prove that he has an impairment severe enough to significantly limit his physical or mental ability to perform basic work. 20 C.F.R. § 404.1520(a)(4)(ii). Third, if the impairment is listed in Appendix 1 of the regulations (the "Listings"), 20 C.F.R. § 404, subpt. P, app. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 16.920(a)(4)(iii). Fourth, if the claimant is unable to make the requisite showing at step three, he must prove that he does not have RFC to perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv). Fifth, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(a)(4)(v); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses, or medical opinions based on these facts, subjective evidence of pain or disability, and the

claimant's education, age and work experience. *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999); *accord Rodriguez v. Colvin*, No. 13 Civ. 7607, 2015 WL 1903146, at *15 (S.D.N.Y. March 31, 2015).

B. Judicial Review

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A reviewing court may only set aside the Commissioner's decision if it is based on legal error or if it is not supported by substantial evidence. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998). Judicial review, therefore, entails two inquiries. First, the court must determine whether the Commissioner applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. *Id.* In order to determine whether substantial evidence exists, the reviewing court "considers the whole record, examining the evidence from both side, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255 258 (2d Cir. 1988). In this context, substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. Shalala*, 94 F.3d 40, 45 (2d Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law. *See Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999).

## C. The ALJ's Decision

The ALJ analyzed Mr. Greenhaus' claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled on or after the date he filed for benefits. (R. at 29-38.) The ALJ first determined that Mr. Greenhaus met the insured requirements of the Social Security Act, through December 31, 2018, and that he had not engaged in substantial gainful activity since March 27, 2014. (R. at 31.) At step two, the ALJ addressed three impairments. He found that Mr. Greenhaus' partial complex seizure disorder qualified as a severe impairment. (R. at 31.) The ALJ, however, determined that Mr. Greenhaus' back impairment did not qualify as a severe impairment because it resulted in no more than minimal limitations in the claimant's ability to perform basic work requirements. (R. at 31.) Likewise, Mr. Greenhaus' residual adult attention deficit hyperactivity disorder, as reported in a neuropsychological exam conducted in 2012, did not constitute a severe impairment because the claimant had the condition for many years and it had no more than a minimal effect on his ability to perform work-related mental activities. (R. at 31.) Neither Party contests the ALJ's findings at step one or two.

At step three, the ALJ found that none of Mr. Greenhaus' impairments, either individually or in combination, was the same or as equally severe as one of the impairments listed in the regulations. (R. at 31-32.) Accordingly, none of them conclusively qualified as a disability. Next, the ALJ reviewed the evidence in the record and concluded that Mr. Greenhaus had the RFC to perform medium work, as defined in 29 CFR 404.1567(c), but should avoid hazardous work conditions, driving, heights, and open work spaces. (R. at 32.) In addition, the ALJ determined that Mr. Greenhaus would be off-task ten percent of the time and miss work once a month. (R. at 32.)

In reaching his RFC determination, the ALJ summarized the medical evidence regarding Mr. Greenhaus' seizure disorder and assigned great weight to the opinions of Dr. Fulco, the non-treating medical expert, and Dr. Mongia, the non-treating consulting physician. (R. at 32-36.)

At step four, the ALJ concluded that in light of the non-exertional limitations identified in the claimant's RFC, Mr. Greenhaus would be unable to perform his past relevant work as a bus driver. (R. at 36.) Nonetheless, at step five, the ALJ found that given Mr. Greenhaus' age, education, work experience, and RFC, Mr. Greenhaus could perform several types of work: (1) medium, unskilled occupations such as a hand packer, janitor, and laundry worker; (2) light, semiskilled occupations such as a file clerk or a host; and (3) light, unskilled work such as a mail clerk. (R. at 36-37.) The ALJ concluded that due to his ability to perform work that exists in significant numbers in the national economy, Mr. Greenhaus was not disabled. (R. at 38.)

## Discussion

Mr. Greenhaus contests the ALJ's finding that he is not disabled on four grounds. First, he contends that the ALJ's determination that his impairment did not meet or equal a listed impairment was based on a misreading of the relevant regulations. Next, Mr. Greenhaus claims that the ALJ's analysis of his RFC was required to, but did not, include a function-by-function analysis. Third, Mr. Greenhaus argues that the ALJ improperly applied the treating physician rule. Fourth, Mr. Greenhaus contends that the ALJ's findings regarding potential jobs in the national economy are inconsistent with his RFC determination.

The Court need not address all these arguments as there is an additional, more fundamental defect in the ALJ's analysis that requires remand. Specifically, the Record omits critical information that the ALJ failed to develop. In light of these gaps, the Court finds that the ALJ did not fulfill his duty to develop the record.

## A. The ALJ's Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence," a court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in original) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). It is well settled that even when the claimant is represented by counsel, the ALJ has an affirmative duty to develop the medical record and seek out further information where the physician's reports are inconsistent and where gaps exist in the record. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). Legal errors regarding the duty to develop the record are a threshold issue warranting remand. *See Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999) (remanding where ALJ failed to fully develop record by failing to obtain or attempting to obtain records).

The treating physician rule "is inextricably linked to the [ALJ's] duty to develop the record." *Lacava v. Astrue*, No. 11 Civ. 7727, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012). "In light of the special evidentiary weight given to the opinion of the treating physician . . . the ALJ must make every reasonable effort to obtain not merely the medical

records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (alteration in original) (internal quotation marks omitted) (quoting *Molina v. Barnhart*, No. 04 Civ. 3201, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005)). "Every reasonable effort means that the ALJ will make an initial request for evidence from the claimant's medical source and make one follow up request between 10-20 calendar days after the initial one." *Assenheimer v. Commissioner of Social Security*, No. 13 Civ. 8825, 2015 WL 5707164, at *15 (S.D.N.Y. Sept. 29, 2015) (internal quotation marks omitted) (quoting 20 C.F.R. § 416.912(d)(1)).

A medical source statement is an evaluation from a treating physician or consultative examiner of "what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Hooper*, 199 F. Supp. 3d at 812 (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)). However, an ALJ's failure to request medical source opinions is not *per se* a basis for remand where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Commissioner of Social Security*, 521 F. App'x 29, 34 (2d Cir. 2013). The need for a medical source statement from the treating physician hinges "on the circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13 Civ. 6303, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34).

Courts, however, have distinguished *Tankisi* and "remanded where the medical record available to the ALJ is not 'robust' enough to obviate the need for a treating physician's opinion." *Hooper*, 199 F. Supp. 3d at 815 (quoting *Sanchez*, 2015 WL at 736102, at *7); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (remanding case where "medical records discuss [claimant's] illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). This requirement applies even where the ALJ has access to treatment notes, test results, and other medical history. *See Santiago v. Commissioner of Social Security*, No. 13 Civ. 3951, 2014 WL 3819304, at *17 (S.D.N.Y. Aug. 4, 2014) ("The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced."); *La Venture v. Colvin*, No. 12 CV 1490, 2014 WL 1123622, at *4-5 (N.D.N.Y. March 20, 2014) (remanding case where the record contained hundreds of pages of medical documentation, including treatment notes, but did not contain any assessments of the claimant's ability to work from the treating physicians).

1. <u>Gaps in the Record</u>

a. <u>The ALJ's Findings</u>

Had the record included thorough medical source opinions from Mr. Greenhaus' treating physicians, the ALJ's decision that Mr. Greenhaus was not disabled may well have been different. At two separate and pivotal points, the ALJ's determinations hinged on aspects of Mr. Greenhaus' medical records that were insufficiently developed.

First, at step three, the ALJ found that Mr. Greenhaus' impairments, either separately or in combination, did not sufficiently meet or equal a listed impairment. Specifically, the ALJ found that Mr. Greenhaus' seizure disorder did not meet the Listings' requirements for Section 11.03 (non-convulsive epilepsy), which would have automatically led to the finding that he was disabled. An individual can meet the requirements of Listing 11.03 if he demonstrates that that the seizure disorder involves: "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. § 404, subpt. P, app. 1, § 11.03. The claimant must also experience "alteration of awareness or loss of consciousness and trainset postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. § 404, subpt. P, app. 1, § 11.03.

In reaching his conclusion that Mr. Greenhaus did not satisfy the requirements for Listing 11.03, the ALJ relied in large part on the testimony of the medical expert Dr. Fulco (R. at 34), who opined that Mr. Greenhaus' seizure disorder did not meet the requirement for transient postictal manifestation of unconventional behavior or interference with activity. (R. at 94-96). At the same time, Dr. Fulco identified a potentially important gap in the record. He noted that there was evidence of a "cognitive deficit with disorientation" in February 2012, but that there was no other, more recent evidence and it was "a thing it needs to be tested. They need to test his memory definitely. And nothing – there's nothing in the file on that." (R. at 98, 107-08.) Dr. Fulco also stated that the medications

Mr. Greenhaus was taking in connection with his seizure disorder could have affected Mr. Greenhaus' memory and concentration. (R. at 107.)

The second significant gap in the record concerns the extent to which Mr. Greenhaus had cognitive deficiencies that would put him "off task" on work assignments – an issue that impacts step five and the ALJ's RFC analysis. After step three, the ALJ concluded that Mr. Greenhaus had the RFC to perform medium work, as defined in 29 CFR 404.1567(c), but should avoid hazardous work conditions, driving, heights and open work spaces. (R. at 32.) In addition, the ALJ determined that Mr. Greenhaus would be off-task ten percent of the time and miss work once a month. (R. at 32.) At step four, the ALJ found that Mr. Greenhaus was unable to perform his past relevant work. At step five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given his age, education, work experience and RFC and the rules in the Grids.

To make these determinations, the ALJ again relied heavily upon the testimony from Dr. Fulco and the examination conducted by the consulting doctor, Dr. Mongia, in addition to testimony from a vocational expert. Dr. Fulco testified that Mr. Greenhaus would likely be "off task" ten percent of the time during his employment. At the same time, however, both Dr. Fulco and the ALJ agreed that if Mr. Greenhaus had cognitive deficits related to memory or concentration or orientation, those deficits might increase the percentage of time that Mr. Greenhaus would be off-task. (R. at 108-09.) Recognizing the lack of a robust record on this very issue, the ALJ stated that he did not "really think that part of the case is well documented." (R. at 108-09.) The vocational expert later testified that if Mr. Greenhaus were off task twenty percent of the time, he would be

"unable to maintain employment . . . because that would be more time off task than what most employers will tolerate." (R. at 116.) If the ALJ had determined that Mr. Greenhaus would be off task twenty percent of the time, as opposed to ten percent, he would likely have also found that Mr. Greenhaus did not have the ability to obtain employment. As even the ALJ recognized, however, the record was insufficient to make that determination.

b. The Consulting Physician's Assessment

The record as it pertains to Mr. Greenhaus' medical history is lengthy, and includes treatment notes and test results from physicians at Southside Hospital and Stonybrook University Hospital, as well as Mr. Greenhaus' primary treating physicians: Dr. Magliulo, Dr. Haimovic, and Dr. Barnowski. The record does not contain, however, any analysis by those treating physicians of Mr. Greenhaus' ability to work, other than cursory, conclusory opinions by Dr. Magliulo set forth in workers' compensation forms.

The only medical source statement in the record was from Dr. Mongia, the consulting examiner, who was not Mr. Greenhaus' treating physician. "[T]he opinions of consulting physicians . . . generally have less value than the opinions of treating physicians. . . . [T]he general rule is driven by the observation that consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Tankisi*, 521 F. App'x at 34 (internal quotation marks omitted). And unlike disabilities that impact strength, pushing, pulling, and so on, the disability here is a cognitive one, the "gravity and impact" of which may vary by individual. *Sanchez*, 2015 WL 736102, at *7 (remanding case for further development where the treating psychiatrist's opinion of the

claimant's psychiatric disorder could "capture what a one-time visit" with a consulting doctor could not).

Furthermore, Dr. Mongia's assessment did not address a number of the key medical issues, including Mr. Greenhaus' alleged cognitive deficits following a seizure, which were central to the ALJ's disability determination. Therefore, this assessment, by itself, cannot support the ALJ's findings regarding whether Mr. Greenhaus can work. *See Woodford v. Apfel,* 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities.").

### c. The Treating Physicians' Assessments

The ALJ failed to obtain disability assessments from Mr. Greenhaus' treating physicians: Dr. Magliulo, his physician; Dr. Barnoski, his treating clinical neuropsychologist; and Dr. Haimovic, his treating neurologist. The only opinions from a treating physician in the Record are the workers' compensation forms filled out by Dr. Magliulo. On each form, Dr. Magliulo stated that Mr. Greenhaus was disabled and unable to work at his current employment for a temporary period of time and opined that Mr. Greenhaus would be able to return to work at a future date. (R. at 394, 400, 649, 659, 662.) These general conclusory statements fail to provide a "sufficient basis" for the ALJ to make a determination regarding Mr. Greenhaus' ability to work and disability under the Social Security Act. *See Martinez v. Colvin*, No. 13 CV 834, 2014 WL 2042284, at *3 (E.D.N.Y. May 19, 2014) ("vague and conclusory" medical determinations do not provide a sufficient basis for the ALJ to make the necessary inferences regarding the claimant's ability to perform work) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)); *Lopez v.*

*Apfel*, No. 98 Civ. 9036, 2000 WL 633425, at *8 (S.D.N.Y. May 17, 2000) (medical doctors' statements were "too general and conclusory to constitute substantial evidence" that plaintiff's disability did not meet the Act's requirements).

Furthermore, workers' compensation forms are provided for the purpose of assessing whether a claimant is entitled to workers' compensation, not Social Security benefits; the same standards do not apply. *See Alves v. Colvin*, No. 13 Civ. 3898, 2014 WL 4827886, at *9 (S.D.N.Y. Sept. 29, 2014) ("[A]n opinion rendered in the context of a Workers' Compensation claim is not instructive with respect to a claim under the [Social Security] Act.").

Although the treating physicians made some findings regarding Mr. Greenhaus' sensation, range of motion and strength, and the frequency of his seizures, among others, these findings do not include any assessments of Mr. Greenhaus' ability to work. *See Nunez v. Berryhill*, No. 16 Civ. 5078, 2017 WL 3495213, at *25 (S.D.N.Y. Aug. 11, 2017) (finding that it was impossible to assess, based on the medical findings in the record, whether the claimant could meet the requirements for light work); *Downes v. Colvin*, No. 14 Civ. 7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (remanding where, even though the evidentiary record contained treatment notes, test results, and assessments of the claimant's RFC from consultative physicians, the ALJ could not have made an informed determination without the treating physicians' medical opinion). In other words, this is not a case, such as *Tankisi*, where the treating physicians' opinions as to the claimant's ability to work was apparent from their notes and it was "only a formal statement of opinion" that was missing from the record. *See Laing v. Commissioner of Social Security*, No. 15 Civ. 7764, 2017 WL 934715, at *15 (S.D.N.Y. March 9, 2017)

("Often, Records that are deemed to be complete without a medical source statement from a treating physician contain notes that express the treating physician's views as to a claimant's residual functional capacity, *i.e.*, the treating physicians' views can be divined from their notes, and it is only a formal statement of opinion that is missing from the Record."). As both Dr. Fulco and the ALJ acknowledged, there were gaps in the record, which required further development.

The record indicates that the Commissioner did send requests for records to Dr. Haimovic on July 8, 2014, and Dr. Barnoski on August 11, 2014. (R. at 46, 126.) Under "Treating Source Summary Disposition," the Commissioner indicates that reports were received from Dr. Barnoski and Dr. Haimovic, but the only documents in the record from either doctor are treatment notes and test results – not any opinion regarding ability to work. (R. at 45.) On July 25, 2014, the Commissioner contacted Dr. Haimovic "requesting clarification regarding frequency of seizures and if they are being controlled by medication." (R. at 126.) In response, Dr. Haimovic's office indicated that they would "submit records from last visits which reportedly contain specifics related to seizures." (R. at 127.) During this follow-up, however, there is no evidence that the ALJ specifically requested Dr. Haimovic's medical opinion, as distinct from mere records, or that the ALJ ever followed up with Dr. Barnoski. *See Ubiles v. Astrue,* No. 11 CV 6340, 2012 WL 2572772, at *9 (W.D.N.Y. July 2, 2012) (remanding where there was only a "vague" statement in doctor's notes that patient was disabled and there was no function-by-function analysis by a treating physician); *Lawton v. Astrue,* No. 08 CV 137, 2009 WL 2867905, at *16 (N.D.N.Y. Sept. 2, 2009) ("The ALJ's failure to re-contact [plaintiff's treating physician] in an attempt to obtain an RFC or medical source statement constitutes

a breach of the ALJ's duty to develop the record, and provides a basis for remand.") Because the Commissioner has not demonstrated that "every reasonable effort" was made to obtain medical opinions from each of the treating physicians, the case should be remanded to the Commissioner to fully develop the Record. *See Hooper*, 199 F. Supp. 3d at 812-14 (remanding where ALJ did not make every reasonable effort to obtain a report setting forth the opinion of the treating physician as to the existence, nature, and severity of the claimed disability); *see also Assenheimer*, 2015 WL 5707164, at *16 (ALJ's efforts were sufficient because there were no gaps in the record and "there was nothing presented at the hearing" to indicate an additional record would have been useful).

B. Plaintiff's Other Arguments

In light of the deficiencies in the record identified above, the Court cannot properly review the ALJ's RFC analysis and his step three and five determinations based on the current record. And because the ALJ failed to fully develop the record with critical information regarding Mr. Greenhaus' ability to work, the Court need not address Mr. Greenhaus' other arguments. But of course, any new assessment by the Commissioner regarding Mr. Greenhaus' disability must take into account any new information submitted by his treating physicians.

The regulatory interpretation issue raised by Plaintiff, however, warrants further discussion. Mr. Greenhaus argues that the ALJ erred at step three by not finding that his seizure disorder met the Listings' requirements for Section 11.03 (non-convulsive epilepsy), which would have automatically led to the finding that the claimant was disabled.

In order to show that an impairment matches a Listing, the claimant must show that his or her impairment meets all of the specified medical criteria. 20 C.F.R. § 404.1525(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify. *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). An individual can meet or equal the requirements for Listing 11.03 if he demonstrates that that the seizure disorder involves: "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least three months of prescribed treatment." 20 C.F.R. § 404, subpt. P., app. 1, § 11.03. The claimant must also experience "alteration of awareness or loss of consciousness and trainset postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. § 404, subpt. P., app. 1, § 11.03; *see also Guy v. Astrue*, 615 F. Supp. 2d 143, 162 (S.D.N.Y. 2009) (requirements not met where the claimant's seizures were not described in detail and did not affect his daily activities).

Mr. Greenhaus argues that under the regulations, evidence of "alteration of awareness" would have been sufficient, independent grounds to find that his condition met Listing 11.03's requirements. (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings at 9.) Under this interpretation of the regulations, claimants are required to show either (1) a loss of consciousness and awareness *or* (2) an impact on the claimant's behavior and daily activity, but not both. The Commissioner argues that Mr. Greenhaus' interpretation "contradicts a common sense reading of the statute" and that it is clear that to meet the requirements of Listing 11.03, he "would need

to demonstrate (1) alteration of awareness or loss of consciousness *and* (2) transient postictal manifestations of unconventional behavior or significant interference with activity during the day. In other words, there are two requirements in the last sentence of Listing 11.03 – one related to awareness/consciousness and one related to behavior/activity." (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgement on the Pleadings and in Opposition to Plaintiff's Motion at 15.)

The Court agrees with the Commissioner's reading of the relevant regulations. A plain text reading of Listing 11.03 requires the claimant to show either alteration of awareness or loss of consciousness in addition to post-seizure manifestations or significant interference with activity during the day. *See Selph v. Secretary of Health & Human Services*, 872 F.2d 1028, 1989 WL 34102, at *3 (6th Cir. 1989) ("Section 11.03 requires (1) that the seizures occur more frequently than once a week in spite of at least three months of prescribed treatment, (2) that there be either alteration of awareness *or* loss of consciousness, and (3) that there be either transient postictal manifestations of unconventional behavior *or* significant interference with activity during the day.") Whether Mr. Greenhaus meets these requirements must of course be determined on remand in light of the fully developed record.

## Conclusion

For the reasons stated above, the Plaintiff's motion for judgment on the pleadings (Dkt. 10) is GRANTED, the Defendant's cross-motion is DENIED (Dkt. 14), and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          March 30, 2018